LEE R. FREELAND *et al.*, Plaintiffs-Appellees· and Cross-Appellants, *v.* RICHARD DICKSON, Defendant-Appellant and Cross-Appellee.

Fourth District   No. 14511

Opinion filed August 11, 1978.—Rehearing denied September 14, 1978.

14

Monroe, Wilson, Dyar, Houchen, McDonald & Taylor, of Decatur, for appellant.

Wayne L. Bickes, of Rosenberg, Rosenberg, Bickes & Johnson, Chartered, of Decatur, and John H. Armstrong and Richard F. Record, Jr., both of Craig & Craig, of Mattoon, for appellees.

Mr. JUSTICE TRAPP delivered the opinion of the court:

Defendant appeals from a mandatory injunction which requires him to remove all "artificial obstructions" in a "waterway" across the land of the defendant lying east of a highway culvert on the west boundary of defendant's land "to maintain the maximum elevation of the waterway flowing east at the level of the flow line at the east end of the culvert," and enjoining him from erecting any "additional artificial obstructions" to the flow of surface water in the waterway. Defendant was further ordered to remove all silt from a grassed area east of the culvert and "to maintain the same in the future at an elevation at least 5 inches lower than the east flow line at the east end of the culvert." The decree finds that the level of a "grassed area" in defendant's field opposite the east end of the culvert is 10 inches higher than the flow line of the culvert at its east end. Literally speaking, the "maintenance" requirements appear contradictory.

Plaintiffs cross-appeal from that portion of the court's decree which required them "to maintain the elevations in the waterway west of the culvert as they existed in December 1975." This portion of the decree is directed to evidence that before December 1975, plaintiffs' land, the field

at the point where water flowed into the west end of the culvert, was something more than a foot higher than the bottom of the culvert, but that early in 1976 plaintiffs, by excavation, lowered the level in the field to the level of the bottom of the culvert.

The land of plaintiffs lies immediately west of a township highway and the land of the defendant is immediately east. Surface water on plaintiffs' land naturally flows east through a highway culvert on to, and across, defendant's land. The township highway is a higher elevation than the adjacent fields of the parties and is a barrier to the normal surface drainage. It appears that in times of heavy rainfall water will flow across the highway.

Examination of the record discloses that the use of the term "waterway" in the decree with regard to defendant may be misleading. It appears that the natural elevation of defendant's land permitted the natural flow of surface water in a generally easterly course from the west. The record does not show that a waterway as a channel or way had been constructed upon measured elevations and upon engineering principles to form an artificial channel designed to alter or improve natural drainage. The record does show, however, that plaintiffs had altered the natural course of surface drainage to speed the flow of water.

At the east end of the culvert an area in defendant's field had been, for many years, left in grass. The grassed area is described as some 50 feet in an east-west direction and about 30 feet wide. A witness for defendant stated that he had planted the grass when he farmed the land some 25 years prior. Other estimates of the time range from 8 to 10 to 20 years or more. The record is clear that defendant did not create the grassed area, although he had left it in place and used it as a "turn-around" for machinery.

A plaintiff testified that in November 1975, he found a large rock at the east end of the culvert which he removed. It appears that at that time he excavated dirt at the east outlet of the culvert. Thereafter, defendant piled white rock opposite the outlet of the culvert and when that washed away he replaced the rock with stones and posts to an elevation which the trial court found to be 22 inches higher than the flow line at the east end of the culvert.

In *Geis v. Rohrer* (1957), 12 Ill. 2d 133, 136, 145 N.E.2d 596, 598, the court stated:

> " 'Where water from one tract of land falls naturally upon the land of another, the owner of the lower land must suffer the water to be discharged upon his land and has no right to stop or impede the natural flow of the surface water.' "

■■ The record is clear that the effect of the placing of rock and posts to a height of 22 inches above the natural level of the ground impeded the

natural flow of surface water, and that portion of the decree which requires defendant to remove such material is affirmed.

The decree found that the elevations of defendant's field immediately opposite the east end of the culvert and described as the grassed area was approximately 10 inches higher than the east flow line of the culvert. An issue is whether the evidence supports the determination that defendant must excavate or otherwise lower the natural water course to the flow line of the culvert and to an elevation 5 inches below the flow line of the culvert, and "to maintain the maximum elevation of the waterway flowing east at the level of the flow line at the east end of the culvert."

Literally speaking, such provision would require the creation of a ditch or channel of unspecified width and length across the field of the defendant. The only testimony concerning the elevations of the field based upon consideration of measured elevations is that of plaintiffs' witness, John Guillo, a licensed professional engineer specializing in hydraulics. While presently engaged in the consulting practice of civil engineering, the witness had taught for 17 years at the University of Illinois in that field, and was Chief Water Engineer for the State of Illinois for 10 years. As a consultant on hydraulics, some 80 percent of his work is concerned with the natural flow of surface water. Guillo had visited the site of the problem on 5 occasions and had caused elevations to be taken and plats drawn. In quick synopsis, the record shows that as an expert he refused to say that the course of natural drainage across defendant's land should be lowered to the level of the bottom of the east end of the culvert, or to an elevation 5 inches below that level.

Counsel and the court speak of, and witnesses testified to the "flow line" of the culvert. The term does not appear to be defined. There is testimony that the culvert was half-filled with dirt. From the testimony of Guillo concerning elevations, we interpret the term "flow line" to mean the bottom of the culvert as distinguished from its condition of being half-filled with dirt.

Guillo testified to his observation and experience that culverts on township highways constructed in the past years were customarily built so that the bottom of the culvert was below the level of the fields on either side. He stated that he would expect the natural drainage level in the fields at the opposite opening of the culvert to be as much as 2 feet higher than the bottom of the culvert. Such manner of construction was used to avoid raising the level of the road, or to create a hump in the road at places where they crossed culverts. In terms of such manner of construction, it was expected that at times of extraordinary rainfall water would flow across the highway in its natural course. He also stated that the culverts so built were, in the course of time, stabilized by filling with dirt

until a usual flow of water would pass through the structure and on to the fields.

This manner of construction appears to be corroborated by the testimony of plaintiff, Lee Freeland, that in the spring of 1976 he lowered his field on the west end of the culvert something over a foot so that the water would emerge from his land at the level of the flow line of the culvert. There is no persuasive reason to conclude that the highway culvert was constructed with a flow line below the level of the field on its west end but level with the natural drainage of the field immediately east of the culvert.

The substance of Guillo's testimony was that the rock and posts which he stated were on the highway right-of-way several feet west of the defendant's field served as a plug at the end of the culvert and should be removed. As to the elevation of defendant's field, he stated that at a point 30 feet east of the *center of the road* the field should be no higher than about 14 inches above the flow line at the east end of the culvert. We note again the trial court's finding that the field level was 10 inches above such flow line.

The testimony of plaintiffs and the other witnesses upon the issue was generally vague and unspecific. Defendant did testify that he believed that the level of the field at the east end of the culvert was about 2 feet higher than the bottom of the culvert. The plaintiffs stated that water stood in their field following a 3½-inch rain, but had not done so before. Apparently, the placing of the large rock at the east end of the culvert contributed to the standing water. Plaintiffs offered some testimony concerning the manner of plowing and working the fields by defendant to alter the course of natural flow. All witnesses testified, however, that the manner of the field work was normal and was that used by most farmers. There was no testimony of an unusual or perverse scheme of tilling designed to alter the course of flow. It is indeed apparent that no plowing or other field work had been done in the area covered with grass in many years.

■■ While the owner of the dominant estate has an easement over the land of the servient estate (*Pinkstaff v. Steffy* (1905), 216 Ill. 406, 75 N.E. 163), we have found no cases which require the owner of the servient estate to improve or aid the natural flow of surface water from the dominant estate.

Upon the record, the portion of the decree requiring defendant to excavate or lower the existing natural course of surface drainage as specified in the decree is contrary to the manifest weight of the evidence. *Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 356 N.E.2d 32.

■■ We consider plaintiffs' cross-appeal from that portion of the decree

which required them "to maintain the elevations in the waterway west of the culvert as they existed in December 1975." Lee Freeland lowered the course of a natural drainage on the west end of the culvert more than a foot. While not clearly stated, the record suggests that plaintiffs had sought to improve the natural surface drainage by "shaping" the elevations in their field to produce an uninterrupted and even flow of surface water to the point where it left their land in the course of natural drainage. Such record suggests, without clear specificity, that the improvement extended some 500 feet west of the culvert and created an improved, if not an artificial water course.

In *Templeton v. Huss* (1974), 57 Ill. 2d 134, 311 N.E.2d 141, the court reviewed the history of drainage law in this State. The opinion quoted from *Peck v. Herrington* (1884), 109 Ill. 611, 619, where the court said: "* * * It may also be regarded as a well settled rule that the owner of the upper field can not construct drains or ditches so as to create new channels for water in the lower field, but he may make such drains, for agricultural purposes, on his own land, as may be required by good husbandry, although by so doing the flow of water may be increased in a regular, well-defined channel, which carries the water from the upper to the lower field," and noted that the "good husbandry rule" was codified in section 2—1 of the Illinois Drainage Code (Ill. Rev. Stat. 1973, ch. 42, par. 2—1) in the language:

"Land may be drained in the general course of natural drainage by either open or covered drains. When such a drain is entirely upon the land of the owner constructing the drain, he shall not be liable in damages therefor."

See also *Bossler v. Countryside Gardens, Inc.* (1976), 44 Ill. App. 3d 423, 358 N.E.2d 352.

It is possible that the plaintiffs, in constructing their improved drainage system did lower the level of the course of natural drainage between the east edge of plaintiffs' field and the west end of the culvert as such natural drainage crossed the highway right-of-way to enter the culvert. So far as the record discloses, the natural surface drainage on plaintiffs' land as improved was directed to and discharged in the area where it had naturally left plaintiffs' field. We conclude that the decree is contrary to law in so far as it required plaintiffs to restore the level of the natural drainage on their own land to the level at which it existed in December 1975, and such portion of the decree is reversed.

■■  The decree, in so far as it requires defendant to lower the elevation of the grassed area presently providing a course of natural drainage across the defendant's field and "to maintain the same in the future at an elevation of at least 5 inches lower than the east flow line at the east end of

the culvert," and in so far as it is construed to require defendant to lower his field and "to maintain the maximum elevation of the waterway flowing east at the level of the flow line at the east end of the culvert," is reversed and the cause is remanded for further proceedings not inconsistent with the views expressed.

Affirmed in part; reversed in part and remanded with directions.

MILLS, P. J., and CRAVEN, J., concur.